## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**KANWAR BIR SINGH**,
42 Franklin Street, Suite 1
Somerville, MA 02145

**HARPAL SINGH**,
2457 Amantea Way
Dublin, CA 94568

**SATWINDER SINGH,**
**EX REL. A.S.G. (MINOR),**
21300 Hidden Pond Place
Ashburn, VA 20148

       *Plaintiffs*,

v.

**LIEUTENANT GENERAL JAMES C.**
**MCCONVILLE**, in his official capacity as
Deputy Chief of Staff, G-1, U.S. Army
300 Army Pentagon
Washington, DC 20310

**THE UNITED STATES DEPARTMENT**
**OF DEFENSE**,
1400 Defense Pentagon
Washington, DC 20301

**ASHTON B. CARTER**, in his official
capacity as Secretary of Defense,
1400 Defense Pentagon
Washington, DC 20301

**THE UNITED STATES DEPARTMENT**
**OF THE ARMY**,
101 Army Pentagon
Washington, DC 20310

Civil Action No. _____

**COMPLAINT**
(Jury Requested)

**PATRICK J. MURPHY,**
in his official capacity as
Acting Secretary of the U.S. Army,
101 Army Pentagon
Washington, DC 20310

     *Defendants.*

Eric S. Baxter (D.C. Bar No. 479221)
Eric C. Rassbach (D.C. Bar No. 493739)
Daniel Blomberg (*pro hac vice* pending)
Diana M. Verm (D.C. Bar No. 1811222)
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC, 20036
(202) 955-0095 PHONE
(202) 955-0090 FAX
*ebaxter@becketfund.org*

Amandeep S. Sidhu (D.C. Bar No. 978142)
Emre N. Ilter (D.C. Bar No. 984479)
McDermott Will & Emery LLP
500 North Capitol Street, N.W.
Washington, DC, 20001
(202) 756-8000 PHONE
(202) 756-8087 FAX
*asidhu@mwe.com*

Harsimran Kaur Dang (D.C. Bar No. 493428)
Gurjot Kaur (*pro hac vice* pending)
The Sikh Coalition
50 Broad Street, Suite 1537
New York, NY, 10004
(212) 655-3095 PHONE
*harsimran@sikhcoalition.org*

*Counsel for Plaintiffs*

## NATURE OF THE ACTION

1.   Plaintiffs Kanwar Bir Singh, Harpal Singh, and A.S.G. (a minor) are exemplary models of the American soldier. They are men of the highest integrity, intelligence, patriotism, courage, and physical strength and agility.

2.   But rather than welcoming Plaintiffs into military service on equal terms with all other soldiers, Defendants Lieutenant General James C. McConville, the Department of Defense, Secretary Ashton Carter, the United States Army, and Acting Secretary Patrick J. Murphy (collectively, the "Army") have engaged in blatant discrimination against Plaintiffs based on their religion.

3.   Plaintiffs are all observant Sikhs.

4.   A core tenet of Sikhism—mandated by the Sikh prophets and required by the *Rehat Maryada*, the official Sikh Code of Conduct—forbids Sikhs from shaving or cutting their hair and requires them to keep their hair in a cloth head covering or turban.

5.   These tenets of their faith—maintaining *kesh* (hair) unshorn and wearing a turban—pose no legitimate obstacle to their service in the United States military.

6.   The Department of Defense and Army's own regulations *require* the Army to accommodate soldiers' religious exercise, so long as the "accommodation would not adversely affect mission accomplishment." DoDI 1300.17(4)(*f*); AR 600-21 § 5-6.0.

7.   There is no doubt that the Army can accomplish its mission while allowing Sikh soldiers to maintain unshorn hair and wear turbans while serving.

1

8.   Observant Sikhs served in the U.S. military from the early 1900s into the early 1980s, when the Army and other branches began strictly enforcing a beard ban and related uniform and grooming policies, effectively banning Sikhs as well.

9.   Over the last six years, at least four Sikhs have been granted religious accommodations to serve in the Army with their unshorn hair, beards, and turbans in place.

10. Altogether, American Sikhs have served in the U.S. military with honor and distinction as officers, in intelligence, as medical personnel, in the Special Forces, as paratroopers, and in the infantry—including in active combat zones and actual battle.

11. Among their ranks are recipients of the Army's Silver Oak Leaf Cluster Award, the Bronze Star Medal, the Meritorious Service Medal, and the Army Commendation Medal.

12. An observant Sikh has been inducted into the Army's Officer Candidate School Hall of Fame.

13. For many years, another fully-bearded Sikh was responsible for teaching other Army soldiers how to use their gas masks and other protective gear to survive nuclear and biological warfare.

14. Observant Sikhs have likewise served, and continue serving, in the militaries of Australia, Canada, India, and the United Kingdom.

2

15. Indeed, Canada's current Defense Minister—a decorated military veteran who advised top U.S. generals in Afghanistan—is himself an observant member of the Sikh faith with an untrimmed beard.[1]

16. The evidence is overwhelming that observant Sikhs in the U.S. military have been welcomed by their peers and immediate commanders, have strengthened the *esprit de corps* in their units, have satisfied the same fitness and safety standards as their fellow soldiers, and have contributed to military uniformity by keeping their beards neat and tidy and their turbans in conformity with standard-issue headgear.

17. Yet the Army and certain of its officers—including Defendant Lieutenant General James C. McConville—continue engaging in blatant religious discrimination against Sikh soldiers in an apparent attempt to keep them from serving their country.

18. Part of that discrimination is encoded in Department of Defense and Army regulations.

19. New regulations enacted in January 2014 state that the Department of Defense "places a high value on the rights of members of the Military Services to observe the tenets of their respective religions" and that "the Military Departments *will* accommodate individual expression of religious belief." Dep't of Defense Instruction ("DoDI") 1300.17(4)(a) and (b) (emphasis added).

---

[1]  *See* Siobhán O'Grady, *Canada's New Defense Minister Made His Own Gas Mask to Work With His Sikh Beard*, Foreign Policy, Nov. 5, 2015, http://foreignpolicy.com/2015/11/05/canadas-new-defense-minister-made-his-own-gas-mask-to-work-with-his-sikh-beard/ (last visited March 28, 2016).

20. Yet those same regulations inexplicably require soldiers to comply with military rules like the beard ban that violate their faith while they seek a religious accommodation, *see* DoDI 1300.17(4)(g), placing them in a true "Catch-22" situation where they are forced to violate their faith to prove they deserve a religious accommodation.

21. Moreover, the regulations require soldiers with religious accommodations to reapply with every "new assignment, transfer of duty stations, or other significant change in circumstances, including deployment," regardless of whether their religious exercise actually conflicts with the military's mission at their new duty station. DoDI 1300.17(4)(j).

22. These defects in the regulations create an environment where Sikh soldiers and future soldiers are regularly subjected to blatant religious discrimination.

23. In 2010, for example, Major Tejdeep Singh Rattan obtained a historic religious accommodation that allowed him to serve as an Army dentist with his Sikh articles of faith. After successfully completing his training, he was deployed to Afghanistan as a General Dentist with the 673rd Dental Company (Area Support) and was locally attached as the Brigade Dentist to the 710th BSB, 3 BCT/10th Mountain Division at Forward Operating Base Pasab (formerly Wilson).

24. In recognition of Major Rattan's exemplary service in Afghanistan, he was recommended for a Bronze Star Medal and was awarded the Army Commendation Medal. After returning from his deployment to his posting as a general dentist at Fort Drum in New York, Major Rattan was accepted into a highly selective residency in oral and maxillofacial surgery at Fort Bragg, North Carolina, that was scheduled to begin in May 2012. Major Rattan, then a Captain, was concurrently

selected for the Captain's Career Course (a precursor to promotion to Major) at Fort Sam Houston, Texas, that was to take place from March 21 to May 23, 2012.

25. Before Major Rattan was permitted to travel to Fort Sam Houston or Fort Bragg, however, he was required to go through the onerous process of requesting an extension of his December 2009 religious accommodation. Although Major Rattan submitted this request to extend his existing religious accommodation on December 27, 2011, it was not granted until March 16, 2012.

26. On heels of a deployment to Afghanistan, the eighty-day waiting period was extremely stressful for Major Rattan since his slots in the Captain's Career Course at Ft. Sam Houston and residency at Ft. Bragg were in jeopardy of being canceled if an extension of his religious accommodation was not granted by the Army. It also delayed Major Rattan's relocation of his family from Fort Drum to Fort Bragg, as the Army would not authorize the movement of his household goods until the extension was granted. As a result, Major Rattan had to delay the purchase of a new home in North Carolina, cancel multiple flights, and endure other hardships that are not imposed on non-Sikh service members.

27.  Iknoor Singh was a rising junior at Hofstra University when he sought to join the Reserve Officers' Training Corps ("ROTC"). As an observant Sikh, he was denied admission in part because of his religiously-mandated beard, hair, and turban. In June 2015, this Court entered an order noting that the Army has roughly 100,000 soldiers who are permitted to wear beards for medical reasons and that approximately half of those exemptions are permanent. *Singh v. McHugh*, 109 F. Supp. 3d 72, 95 (D.D.C. 2015) (Jackson, J). Because the Army had no meaningful basis for

distinguishing these medical beards from Iknoor Singh's religious beard, *see id*. at 95-96, the Court enjoined the discriminatory treatment of Iknoor Singh.

28. Captain Simratpal Singh joined the Army in 2006, after being admitted into the United States Military Academy at West Point. Although he had maintained his Sikh articles of faith for his entire life—maintaining unshorn hair and beard and wearing a turban—he was not offered any form of religious accommodation at West Point and made the difficult choice to abandon his Sikh identity in order to serve his country. After ten years of exemplary service, including becoming an Army Ranger, being deployed to Afghanistan, and receiving a Bronze Star Medal for meritorious action in combat, Captain Singh sought to restore maintaining his articles of faith as an observant Sikh. Captain Singh first exhausted sixty days of personal leave to give the Army time to review and grant his accommodation. He eventually was granted a temporary accommodation from December 8, 2015 through March 31, 2015, with assurances that a permanent accommodation would be forthcoming. Then in late February 2016, Captain Singh was ordered to report for three days of extraordinary "safety" testing for his helmet and gas mask, even though he had already passed the standard safety testing that all soldiers must undergo. On March 3, 2016, this Court issued an order confirming that the testing was "unfair and discriminatory," with "a chilling effect on religious minorities . . . who desire lawfully to practice their religion while serving this country in the Armed Forces." *Singh v. Carter*, --- F. Supp. 3d ---, 2016 WL 837924, at *11, *14 (D.D.C. Mar. 3, 2016).

29. Taranbir Singh is another observant Sikh who was discriminated against because of his faith when he sought to join the Army. In February 2013, he enlisted through the Army's Military

Accessions Vital to the National Interest ("MAVNI") program and submitted a request for a religious accommodation. One month later, Taranbir Singh's Army recruiters denied his request for accommodation, claiming they lacked authority to grant it, and discharged him for failure to comply with the Army's grooming requirements. They told him the decision could be appealed to the Army's Deputy Chief of Staff (G-1) officer. Efforts to appeal extended over an entire year, until after January 2014, when the Army issued DoDI 1300.17, which sought to regularize the process for religious accommodations. At that point, Taranbir Singh was told that his denial could not be appealed because he was no longer in the Army. Although Taranbir Singh was only discharged because his accommodation was wrongfully denied, the Army has refused to allow him readmission into the Army.

30. Plaintiffs in this matter have all experienced similar discrimination because of their faith.

31. Plaintiff Specialist Kanwar Singh entered the military through the ROTC at Boston University and then through the Massachusetts Army National Guard. He filed a request for religious accommodation nearly eight months ago, on August 12, 2015. Scheduled to begin Basic Combat Training (BCT) at Fort Leonard Wood, Missouri, on May 31, 2016, he still has not received a response to his accommodation request.

32. While in the ROTC, Specialist Kanwar Singh was permitted to participate in unit drills, but—because of this religious beard and turban—was not allowed to wear a uniform. He was also told he could not get an Army contract through the ROTC because of his articles of faith. Denied that route, he sought enlistment through the National Guard instead. Although admitted in August 2015, he was kept separate from his fellow soldiers for the first six months and not allowed to

attend weekend drills with his unit. Instead, he was ordered to report two weekdays a month to an office where he performed general office tasks in place of the field exercises that other unit members engaged in. It was only in February, after he started a new job that no longer allowed him to complete his National Guard service during the week, that he was allowed to join his unit for weekend drills. He still has not been issued a uniform or a full military ID or been allowed to handle a weapon.

33. On March 12, 2016, despite the fact that his accommodation request had been pending for more than seven months, Specialist Kanwar Singh was called in by his commander during the weekend drill and asked whether he would agree to shave so he could meet his BCT deadline of May 31, 2015. Specialist Kanwar Singh was told that the request had come directly from Defendant Lieutenant General McConville. He has been told several times that the religious accommodation process exists to make sure that he wants to serve his country for the "right reasons."

34. Plaintiff Specialist Harpal Singh first sought to join the Army through the MAVNI program, based on his fluency in three languages—Punjabi, Hindi, and Urdu—that are a priority for the Army, and also for his expertise in telecommunications technology. In 2012, he went to join with two friends—one a non-observant Sikh, the other a Hindu. They were both admitted into the program while he was rejected, because he maintains the Sikh articles of faith, including unshorn hair (*kesh*) and wearing a turban. Still desiring to serve his country, Specialist Harpal Singh reapplied in spring 2015 and was given a six-year contract that November. He immediately filed a request for religious accommodation. Although he is scheduled to report for BCT on May

8

9, 2016, his still-unresolved request for accommodation has now been pending for more than four months.

35. Plaintiff Private A.S.G. is currently a high school senior in Ashburn, Virginia. He too is a life-long observant Sikh. He is also a highly committed and talented young man with extensive experience as a civilian volunteer in two military auxiliary programs, the Civil Air Patrol and the Virginia Defense Force. On December 17, 2015, he enlisted with the Virginia Army National Guard and requires a religious accommodation to attend BCT, which is scheduled to commence May 23, 2016. In the process of seeking an accommodation, Private A.S.G. was interviewed by a chaplain, who was supposed to confirm whether Private A.S.G.'s religious beliefs are sincere. The interview focused instead on Private A.S.G.'s patriotism. He was asked, for example, whether he would be willing to kill another Sikh in an opposing army if required to do so for his country—a question that presumably would never be asked of a future soldier from a Christian tradition, for example.

36. As these scenarios demonstrate, the Army has a long pattern and practice of discriminating against Sikhs striving to serve their country by joining the military. The Army's regulations promise that soldiers whose religious exercise poses no significant obstacle to the military's mission will be generously accommodated. In reality, however, the regulations themselves are defective and foster religious discrimination on a number of levels.

37. The regulations are explicitly discriminatory on their face in that they force soldiers who need religious accommodations to violate their religious beliefs before they can apply for an

accommodation, even if their religious exercises would clearly have no impact on the military's compelling interests.

38. The regulations are also facially discriminatory in that they require soldiers to reapply for a religious accommodation every time they have a "transfer of duty stations, or other significant change in circumstances"—again regardless of whether the change would have any real impact on the Army's compelling interests. *See* Report No. DODIG-2015-148 at 17-18, Department of Defense Inspector General, *Rights of Conscience Protections for Armed Forces Service Members and Their Chaplains* (July 22, 2015), http://www.dodig.mil/pubs/documents/DODIG-2015-148.pdf (noting that Army officials warned that current policy "may have created barriers to planning a long-term military career" and has "burdened members of some faith groups specifically recruited for their language, culture, and technical skills," which "was a potential contributor to a loss of human investment in human capital essential to completing missions"; the report concluded that the policy "places a significant burden" on service members and recommends its revocation).

39. The ambiguity in the regulations also creates an environment where the Army feels free to delay resolving requests for accommodation for long periods of time, leaving future soldiers in limbo and potentially forcing them to forgo other education and career opportunities while they wait for the Army's decision.

40. The ambiguity in the regulations further fosters an environment where commanders such as Defendant Lieutenant General McConville feel free to directly pressure soldiers to violate their religious convictions if they want to serve in the military and to indirectly pressure them by

separating them from their units, refusing to let them wear a uniform even when otherwise participating in military drills, and questioning their patriotism because of their faith.

41. The Army's discrimination against Sikhs generally, and against Plaintiffs specifically, violates their rights under the Religious Freedom Restoration Act of 1993 and the First and Fifth Amendments to the United States Constitution.

42. Plaintiffs thus seek declaratory and injunctive relief by April 30, 2016, to protect them from being forced to choose between serving their country and remaining true to the core tenets of their faith, and also to allow them to meet their May 2016 BCT report dates.

## JURISDICTION AND VENUE

43. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1361.

44. Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1).

## IDENTIFICATION OF PARTIES

45. Plaintiff Specialist Kanwar Singh is an observant Sikh and a member of the Massachusetts Army National Guard.

46. Plaintiff Specialist Harpal Singh is an observant Sikh and a member of the Army's MAVNI program.

47. Plaintiff Private A.S.G. is an observant Sikh and a member of the Virginia Army National Guard. Because Private A.S.G. is a minor, he brings this complaint through his father, Satwinder Singh.

48. Defendants are appointed officials of the United States government and United States governmental agencies responsible for the United States military and its grooming policies.

49. Defendant Lieutenant General James C. McConville is the Deputy Chief of Staff (G-1) U.S. Army. In this capacity, he has responsibility for religious accommodations in the Army, including Plaintiffs' requests for accommodation. General McConville is sued in his official capacity only at this time.

50. Defendant United States Department of Defense is an executive agency of the United States government and is responsible for the maintenance of the United States military.

51. Defendant Ashton B. Carter is the Secretary of the United States Department of Defense. In this capacity, he has responsibility for the operation and management of the armed forces. Secretary Carter is sued in his official capacity only.

52. Defendant Department of the Army is a department of the United States military and is responsible for the promulgation and administration of its own grooming policies and regulations.

53. Defendant Patrick J. Murphy is the Acting Secretary of the United States Army and is responsible for the operation and management of the United States Army. Secretary Murphy is sued in his official capacity only.

## FACTUAL ALLEGATIONS

Plaintiffs' Sikh Faith

54. Sikhism is a monotheistic religion that originated in the fifteenth century in the Punjab region of South Asia.

12

55. While relatively young compared to other major world religions, it is the world's fifth largest faith tradition with nearly 25 million adherents.[2]

56. There are approximately 500,000 Sikhs in the United States.[3]

57. The founder of the Sikh faith, Guru Nanak, was born in 1469 in Punjab, India.

58. The Sikh religion is monotheistic, believing in one God who is all loving, all pervading, and eternal. This God of love is obtained through grace and sought by service to mankind.

59. Guru Nanak rejected the caste system and declared all human beings, including women, to be equal in rights and responsibilities and ability to reach God. He taught that God was universal to all—not limited to any religion, nation, race, color, or gender.

60. As taught by the eleven Sikh Gurus—*i.e.*, the first human spiritual leaders who revealed the faith, plus the Guru Granth Sahib, which is the compilation of their writings and considered the final, enduring "Guru"—Sikhs seek to live a disciplined life.

61. Sikhism forbids consumption of alcohol, tobacco, and other drugs, as well as extramarital relations.

62. The Sikh faith emphasizes humility in personal conduct and encourages avoiding materialism and not speaking ill of others. The faith also prizes boldness in standing for truth and defending the oppressed.

---

[2]   *See* The Pew Forum on Religion and Public Life, *The Global Religious Landscape: A Report on the Size and Distribution of the World's Major Religious Groups as of 2010*, at 9 n.1 (2012), http://www.pewforum.org/files/2014/01/global-religion-full.pdf.

[3]   *See* S. Con. Res. 74, 107th Cong. (2001).

63. Consistent with the teachings of the Sikh gurus, Sikhs wear external articles of faith to bind them to the beliefs of the religion. Unlike some other faiths, where only the clergy maintain religious articles on their person, all Sikhs are required to wear external articles of faith.

64. These articles of faith, such as unshorn hair (*kesh*) and the turban, distinguish a Sikh and have deep spiritual significance.

65. Maintaining unshorn hair (*kesh*), including an unshorn beard, is an essential part of the Sikh way of life—one cannot be a fully observant Sikh without abiding by this tenet of faith.

66. Guru Nanak started the practice, regarding it as living in harmony with the will of God. The Sikh Code of Conduct, called the *Rehat Maryada*, outlines the requirements for practicing the Sikh way of life.[4]

67. All Sikhs must follow the guidelines set forth in the *Rehat Maryada*.

68. The *Rehat Maryada* explicitly instructs that Sikhs must "[h]ave, on your person, all the time . . . the *keshas* (unshorn hair)." Exhibit 1 (excerpt of *Rehat Maryada*). The *Rehat Maryada* prohibits the removal of hair from the body as one of four major taboos. One of the other taboos on this list is adultery. That cutting one's hair is a moral transgression as serious as committing adultery speaks to the immense significance of uncut hair in the Sikh religion.

69. The *Rehat Maryada* also mandates that Sikhs wear a turban which must always cover a Sikh's head.

---

[4]  *Sikh Rehat Maryada in English*, SGPC.net, http://new.sgpc.net/sikh-rehat-maryada-in-english/ (last visited March 26, 2016).

70. Vehemently opposed to the then-prevailing caste system, Guru Gobind Singh mandated that all Sikhs wear turbans. As turbans had previously been worn only by royalty, he repurposed the turban to signify the equality of all castes and creeds and all men and women.

71. The turban also reminds Sikhs of their duty to maintain and uphold the core beliefs of the Sikh faith, which include working hard and honestly, sharing with the needy, and promoting equality and justice for all. When a Sikh wears a turban, the turban ceases to be simply a piece of cloth and becomes one and the same with the Sikh's head.

72. Historically, uncut hair and turbans have been central features of the Sikh identity. For example, in the 18th century, Sikhs in South Asia were persecuted and forced to convert from their religion by political leaders. The method of forcing conversions was to remove a Sikh's turban and cut off his or her hair.

73. As resistance to such forced conversions, many Sikhs chose death over having their turbans removed and hair shorn.

74. Since then, denying a Sikh the right to wear a turban and maintain unshorn hair has symbolized denying that person the right to belong to the Sikh faith, and is perceived as the most humiliating and hurtful physical injury that can be inflicted upon a Sikh.

History of Sikh Service in the Military

75.    Service in armed forces has always been—and continues to be—a central part of the Sikh identity. The Sikh martial tradition dates back to the late 17th century and Guru Gobind Singh's creation of the Khalsa, a spiritual order and army comprised of initiated Sikhs, to resist persecution

by the Mughal Empire. Tales of Sikh courage and valor, as documented by the British, date back at least as far as their defeat of the Afghan Pathans in 1813 at the Battle of Attock.[5]

76.   Sikh soldiers famously defeated the British at the Battle of Chillianwala in 1849 before being overpowered six weeks later by superior British weapons.[6] Sikh soldiers soon became "among the sturdiest and trustiest men of the British army,"[7] with a group of twenty-one Sikhs famously repulsing an attack by thousands of Afghans for six hours at the Battle of Saragarhi in 1897[8] and with approximately 100,000 Sikhs—a disproportionately high number among Indian volunteer soldiers —fighting for the British in World War I.[9]

77.   Today, observant Sikhs proudly serve with their articles of faith intact in militaries around the world, most notably in Australia, Canada, Indian, and the United Kingdom, among others, and also as United Nations Peacekeepers, often working closely with American troops in troubled regions. In fact, Canada's recently appointed Minister of Defense, Lieutenant Colonel

---

[5]   Pico Iyer, *The Lions of Punjab*, Time, Nov. 12 1984, at 53, *discussed in* Rajdeep Singh Jolly, *The Application of the Religious Freedom Restoration Act to Appearance Regulations That Presumptively Prohibit Observant Sikh Lawyers From Joining the U.S. Army Judge Advocate General Corps*, 11 Chap. L. Rev. 155, 157 n.13 (2007).

[6]   *Id.*

[7]   *Id.*

[8]   *Sikhs Prove Their Valor, Twenty-one Men Hold Sarhargarti Police Post Against 1,000 Orakzais Over Six Hours*, New York Times, Sept. 14, 1897.

[9]   Jolly, *supra* note 5, at 157.

Harjit Sajjan, supported the U.S.-led coalition in Afghanistan and served as a special advisor to U.S. Army Lieutenant General James Terry, commander of the 10th Mountain Division.[10]

Plaintiff Specialist Kanwar Singh's Commitment to the Sikh Faith

78. Specialist Kanwar Singh was born in New Delhi, India, into a Sikh family.

79. In Delhi, Specialist Kanwar Singh was a religious minority among a predominantly Hindu population.

80. Specialist Kanwar Singh's parents were observant, but not devout.

81. From childhood, Specialist Kanwar Singh has followed Sikhism's strict code of conduct.

82. However, Specialist Kanwar Singh's early religious observance was perhaps more discipline than devotion.

83. His articles of faith provided a strong sense of identity and purpose, binding him to a proud history of Sikh "soldier-saints" who were defenders of the faith.

84. Only later would he personally comprehend the true spiritual significance of these religious practices.

Plaintiff Specialist Kanwar Singh's Desire to Serve in the Army

85. At age seventeen, Specialist Kanwar Singh came to attend college in the United States, where a series of contrasting experiences deepened his faith and engendered a desire to serve in the U.S. military.

---

[10] *See* Christopher Guly, *Defense Minister Harjit Singh Sajjan: A Sikh Soldier's Climb to the Canadian Cabinet*, L.A. Times, Feb. 22, 2016, http://www.latimes.com/world/mexico-americas/la-fg-canada-sajjan-profile-20160222-story.html.

86. An aunt and uncle lived in Virginia, so he looked to attend Virginia Tech to be near them, hoping to study aerospace engineering.

87. His acceptance letter arrived on April 17, 2007, the day after a horrific shooting incident where a Virginia Tech senior killed thirty-two of his fellow students and injured two dozen others.

88. Shaken by this tragedy, Specialist Kanwar Singh's parents forbade him to attend the school.

89. He enrolled instead at Virginia Commonwealth University, pursuing an academic course with a major in business and finance.

90. As for many students, living on his own and finding his path to a career and adulthood was stressful, and in these circumstances, his religious discipline took on greater significance, becoming a source of personal strength and comfort.

91. Prompted by the Sikh military ethic that had informed his religious upbringing, as well as the service of a grandfather and great-grandfather in the World Wars, Specialist Kanwar Singh also felt the desire to give himself in service to his new country.

92. He sought to enroll in the University's Reserve Officer Training Corps (ROTC).

93. Rejected because of his articles of faith, he focused his energy into his studies instead, ultimately completing his degree *magna cum laude* and with University honors in four years.

94. Upon graduation, Specialist Kanwar Singh was employed by Capital One Financial and began working in its Professional Analyst Development Program.

95. He continued the tradition he began in college of regularly attending the Sikh temple or *Gurdwara* to worship and partake in *langar*.

96. Sikh worship involves reciting the writings of the Gurus in chants set to traditional tunes. *Langar* is a communal meal that is generally held following worship. Individuals of any faith or no faith at all may participate.

97. The food is simple vegetarian fare, so that all may partake regardless of religious or dietary restrictions. It is prepared by volunteer members of the Sikh community, who take turns serving participants who sit intermingled in rows on the floor.

98. Both worship and *langar* emphasize the Sikh ethic of equality, generosity, inclusiveness, strength in the defense of others, and care for the poor.

99. On August 5, 2012, Specialist Kanwar Singh was at his local *Gurdwara* in Virginia when news of a shooting at another *Gurdwara* in Oak Creek, Wisconsin, arrived. There, a white supremacist intruded into the Sikh temple where *langar* was being prepared and shot and killed six Sikhs and injured four others before turning his gun on himself.

100.    Recalling the earlier Virginia Tech massacre, Specialist Kanwar Singh was again stunned to feel so close to such hatred.

101.    The shock of that event caused him to reflect deeply concerning his faith and whether he was pursuing the most important things in life.

102. He began for the first time to really study and apply the teachings of the Gurus.

103. This had a profound effect on him. The teachings of the Gurus led him to a more peaceful outlook. He found he was becoming slower to anger and more likely to respond calmly to conflict. He found wisdom and strength in the Sikh scriptures and new confidence in his future goals.

104. At the same time, Specialist Kanwar Singh's father was undergoing a similar transformation of his faith, becoming more religiously observant.

105. These experiences combined to deepen Specialist Kanwar Singh's own faith, including his desire to be of greater service to others.

106. In December 2012, Specialist Kanwar Singh was identified as an emerging political leader by the Sorensen Institute for Political Leadership at the University of Virginia and was selected as one of 35 individuals in the Political Leaders Program Class of 2013. In this program, Specialist Kanwar Singh developed a deep appreciation and respect for Americans from all socio-economic and political backgrounds. He was commended for being independent and for supporting policy ideas from both sides of the aisle. Specialist Kanwar Singh developed deep friendships with his colleagues in the program and had an opportunity to learn about pressing public policy issues from local and state leaders in all regions across the Commonwealth of Virginia. Several of his colleagues in the program were veterans of the U.S. military. Learning about his colleagues' experiences in the military and the opportunity to give back to his new country further sparked Specialist Kanwar Singh's interest in joining the U.S. military.

107. In January 2014, a friend persuaded Specialist Kanwar Singh to move to Boston and shift his career toward investing.

108. He enrolled in Harvard University's Extension Program, where he is pursuing a Master of Liberal Arts in Management.

109. He is also enrolled at the University of Massachusetts (Boston), where he is simultaneously pursuing a Master of Business Administration degree. *See* Exhibit 2 (Specialist Kanwar Singh's Resume).

110. He has been highly successful in these academic pursuits. He maintains a 3.89 GPA in his ALM graduate program and a 3.96 GPA in his MBA graduate program. He will finish both programs in May 2016.

111. He also works as a "teaching fellow" at Harvard University's Division of Continuing Education, has co-authored a text for the course he helps teach, and has been asked to return in the fall as a "co-instructor."

112. In January 2016 he started a full-time position at Hamersley Partners, a Boston investment management marketing firm.

113. On the side, he is an entrepreneur, currently operating as a General Partner at West Street Capital, a research and investment firm he founded for family and friends.

114. In the little spare time he has, Specialist Kanwar Singh served as an "E3! Ambassador," working to improve the quality of life for young Asian Americans as part of a White House Initiative on Asian Americans and Pacific Islanders.

115. Shortly after he arrived in Boston, Specialist Kanwar Singh experienced the counter to what he had felt in response to the Virginia Tech and Oak Creek shootings.

116. In April 2014, U.S. Senator John McCain spoke at Harvard University. Specialist Kanwar Singh was deeply moved by the Senator's military experiences and was transfixed when

Senator McCain closed by encouraging all present to consider serving their country through the military.

117. By then, Specialist Kanwar Singh was aware of other Sikhs admitted to serve and resolved that now was the time for him to serve also.

118. That same week was also the first anniversary of the Boston Marathon bombings.

119. Specialist Kanwar Singh was on Boylston Street to watch the runners and participate in the memorial events. Many of the victims from the bombings were there—some without limbs, others in wheelchairs—to claim victory over the attacks that had maimed them. It was transformational to see them. A number of the victims were very young.

120. Specialist Kanwar Singh knew that something like the bombing could happen again. He knew that the Massachusetts National Guard had been the first to respond after the attacks, and he was impressed by their service.

121. Hearing Senator McCain and recalling the National Guard as a strong force for good in response to the Boston bombings brought to Specialist Kanwar Singh's mind the legacy of service of his own grandfathers and spiritual forbears. He knew he had to continue that legacy.

122. His faith was the motivating factor in his desire to serve, providing a personal foundation for the many parallel values he could see in military service—discipline, loyalty, honesty, respect, selfless service, personal courage, duty, integrity, honor, and the promotion of justice.

123. Knowing that the U.S. Army had provided religious accommodations to Major Kamal S. Kalsi, Major Tejdeep Singh Rattan, and Corporal Simran Preet Singh Lamba—all Sikhs who

currently serve with their Sikh articles of faith intact—within weeks, in May 2014, Specialist Singh

began working with a recruiter to obtain his own admission into the Massachusetts National Guard.

124.   In June 2014 he took the ASVAB—the Armed Services Vocational Aptitude Battery—

and scored in the 99th percentile, the highest possible score on the exam.

Plaintiff Specialist Kanwar Singh's Experience in the Military

125.   Owing to an eye condition that he had corrected, Specialist Kanwar Singh had to wait

until January 2015 to reapply for admission into the National Guard. He focused that semester on

his work, his school, and on becoming an American citizen.

126.   On December 18, 2014, he stood in historic Faneuil Hall and "renounce[d] and abjure[d]

all allegiance and fidelity" to his birth country, swearing to "support and defend the Constitution

and laws of the United States of America," and to "bear arms on behalf of the United States when

required by the law."

127.   Because of the then-pending lawsuit brought by Iknoor Singh for admission into the

ROTC, Specialist Kanwar Singh heard that he might not be admitted into the Massachusetts Army

National Guard.

128.   One of his contacts with the Guard was also an ROTC instructor at Boston University,

who encouraged Specialist Singh to enroll there.

129.   A few days before his naturalization ceremony, on December 14, 2014, Specialist

Kanwar Singh submitted his application to the Boston University ROTC program.

130.   Over the next four and a half months, Specialist Kanwar Singh excelled as an ROTC

cadet. On February 28, 2015, during a Field Training Exercise, he was commended by Major Josh

Goodrich and Sergeant First Class Darius Scott for assisting his platoon in solving a complex field challenge.

131.  His platoon was tasked with transferring "claimed toxic contaminants" using ropes, bar stools, and tire tubes. Specialist Kanwar Singh quickly and expertly engineered a solution that enabled his platoon to solve this complex challenge within the allotted time limit.

132.  On March 6, 2015, Mr. Nathan Holt, a Military Science advisor, commended Specialist Kanwar Singh for helping his squad complete a two-mile run while carrying 10 to 40 pounds of weight.

133.  On March 21, 2015, Specialist Kanwar Singh's platoon and squad leaders commended him for successfully helping his unit provide security and timely evacuation during a mock raid exercise. One of the key milestones before the raid was to spot high-value targets that his unit would be interested in capturing as hostages. Specialist Kanwar Singh was the first person to spot both of them, out of the approximately sixty ROTC cadets present.

134.  He was also recognized by Cadet Company Commander Tyler Wojtasinski for helping accurately to identify how the unit could have avoided casualties during the After Action Review.

135.  During the semester-end ROTC Joint Field Training Exercise from April 10-11, 2015 at Camp Curtis Guild, in Reading, Massachusetts, Specialist Kanwar Singh supported his platoon's various missions.

136.  During a simulated raid operation in which his platoon was tasked with capturing or killing a high-value target, Specialist Kanwar Singh was the first person to spot and engage the enemy target, and was successful in "killing" him.

137.  During another exercise, Specialist Kanwar Singh was able to get useful intelligence by providing villagers with MREs (with his platoon and squad leaders' approval). His cordial and creative communication tactic deescalated the situation and negated the need for his platoon to take the villagers hostage.

138.  During another raid exercise, all of Specialist Kanwar Singh's squad members stepped on Improvised Explosive Devices. As the only uninjured member of his squad, he took charge of the situation, rushed to help his fallen comrades, called for backup help from other squads, delivered first aid, and assisted with MEDEVAC evacuation.

139.  Specialist Kanwar Singh's unshorn hair, beard and turban never interfered with any of his assigned missions.

140.  Although one of the most junior members of his unit, Specialist Kanwar Singh was recognized by his squad and platoon leaders for his active contributions, rational and composed thinking, and high level of engagement. In his view, his faith was a source of strength during many of the exercises.

141.  Despite Specialist Kanwar Singh's exemplary performance, the entire experience was made awkward in that he was never treated as a full and equal member of his battalion.

142.  He was issued a uniform, but not allowed to wear it. In one battalion-wide field exercise, he was mistaken as an "enemy combatant" by one of his fellow cadets because he was not wearing an Army uniform.

143.  He was allowed to participate in all of his unit exercises, but only after extended debate over whether he should.

144. Always lingering was the question of whether he would have the same opportunity as his fellow cadets to pursue a full military career after ROTC. He was told he could not get an Army contract with ROTC due to his articles of faith.

145. As a cadet, Specialist Kanwar Singh attended the ROTC graduation ceremony at Boston University and had the opportunity to meet Defendant Lieutenant General McConville, who was the graduation speaker.

146. Specialist Kanwar Singh was inspired by General McConville's remarks that in the U.S. military there is no allegiance to a king or queen or any other person. There is loyalty only to the Constitution.

147. In May 2015, Specialist Kanwar Singh renewed his application for entry into the Massachusetts National Guard.

148. Although the recruiter discouraged him from "complicating" his admission, Specialist Kanwar Singh pursued a spot in Officer Candidate School.

149. He was accepted, but concerns about his articles of faith were raised in the interview and his general application for admission remained pending.

150. On July 24, 2015, both U.S. Senators from Massachusetts—Senator Edward Markey and Senator Elizabeth Warren—along with Congressman Michael Capuano, submitted a letter to Secretary of Defense Ashton Carter and then-Secretary of the Army John McHugh, supporting Specialist Kanwar Singh's enlistment. *See* Exhibit 3 (Letter from Edward J. Markey, Elizabeth Warren, and Michael E. Capuano).

151.  At that point, the process moved forward, and Specialist Kanwar Singh was admitted on August 6, 2015.

152.  His administrative request for a religious accommodation was submitted on August 12 2015. *See* Exhibit 4 (Specialist Kanwar Singh's request for religious accommodation).

153.  On December 1, 2016, Specialist Kanwar Singh attended a presentation at Harvard University by Defendant Secretary of the Department of Defense Ashton Carter. During the question-and-answer session, Specialist Kanwar Singh asked Secretary Carter "what can we do to ensure anyone who is passionate and patriotic can serve our country without them having to give up on their religious beliefs?"

154.  Secretary Carter responded that "I appreciate your patriotism . . . and I appreciate your faith too."

155.  He also acknowledged that "the new Canadian Defense Minister is a Sikh, by the way, extremely able and capable guy, and he worked with the Canadian forces figuring out how to accommodate the head to a helmet, and so it's all possible."

156.  Secretary Carter further emphasized that "the only way to stay good is to make sure that we are drawing from the largest possible pool. . . . Mission effectiveness depends upon us having access to the largest possible pool of Americans, because this is an all voluntary force. . . . I can't afford to hive off any part of our population and say 'you can't serve simply because of something that doesn't truly have consequence for their ability to serve. . . . We need them!"[11]

_____

[11] *A Conversation with Ashton B. Carter*, Institute of Politics, Harvard University, Dec. 3, 2015, https://www.youtube.com/watch?v=FGugpmN_S8w (beginning at 27:30).

157.   The Department of Defense has subsequently used some of these statements by Secretary Carter to promote diversity in the military.

158.   Specialist Kanwar Singh's treatment within the National Guard has not reflected the same sentiment but has been similar to what he experienced in the ROTC.

159.   In his initial orientation as a new recruit, he was told he would not be issued a uniform and could not attend drills with his unit.

160.   It took several conversations to get a military ID, even though he needed it as proof of health insurance. Even then, he was given only a 90-day temporary ID.

161.   From August 2015 through January 2016, in place of weekend drills with his unit, he was ordered to report to an office two week days each month.

162.   On those days, he was required to show compliance with the minimal physical requirements, but then spent the rest of his hours with no specific assignments or assignments to perform minor office tasks, such as shredding documents.

163.   He was not permitted to stand in formation with his unit.

164.   He has not been allowed to participate in any weapons training, and to date he still has not touched a real weapon.

165.   While Specialist Kanwar Singh is willing to perform any assigned role within the military, he should not be segregated from his unit because of his faith.

166.   Starting a new job in January 2016, Specialist Kanwar Singh informed his commanders that because weekday service would conflict with his job, he preferred to serve on the weekends with his unit.

28

167.  Thus, for February and March of this year, Specialist Kanwar Singh was finally allowed to attend weekend drills with his colleagues, most of whom had no idea who he was and asked why he was there.

168.  He is still not permitted to wear a uniform.

169.  Specialist Kanwar Singh's immediate commander has mentioned to him several times that the religious accommodation process exists to make sure he wants to serve his country for the "right reasons"—an analysis that soldiers who belong to a better-recognized faith would never face.

170.  Specialist Kanwar Singh is scheduled to attend Basic Combat Training (BCT) at Fort Leonard Wood, Missouri, on May 31, 2016.

171.  In late February or early March, Specialist Kanwar Singh was informed that he could not attend BCT if his accommodation were not granted 45 days in advance, which he calculated would give him until April 15 to secure the accommodation.

172.  As of the date of this filing, Specialist Kanwar Singh's request for accommodation has been pending for 230 days.

173.  This is a gross violation of the Army's own regulations. Religious accommodations can only be granted at or above the Deputy Chief of Staff (G-1) level. Dep't of Def. Instruction 1300.17(4)(f)(2)(a), http://www.dtic.mil/whs/directives/corres/pdf/130017p.pdf; Army Reg. 600-21, § 5-6*i*(1).

174.  The request, however, must first be submitted to the soldier's immediate commander, who has no authority to grant or deny uniform and grooming requests, but has "ten working days" to make a "recommendation." Army Reg. 600-20, § 5-6*i*(2).

175.  The soldier must then obtain review by the unit chaplain and legal officer before appealing up through each level of command to the G-1. *Id.* § 5-6*i*(5)-(7). Each officer up the chain can again make recommendations, but has no authority to grant or deny the request. *Id.* § 5-6*i*(1).

176.  Once the appeal through the chain of command commences, the regulations allow thirty days for a request to make its way to the G-1. *Id.* § 5-6*i*(11).

177.  The G-1 then has thirty more days to make a final decision. *Id.* § 5-6*i*(10).

178.  Thus, depending on how long it takes to obtain endorsements from the unit chaplain and legal officer, it may take up to ninety days or so for an accommodation to be approved.

179.  The need for even ninety days to process a request for accommodation is questionable. There is no justification, however, for leaving Specialist Kanwar Singh's request pending for more than 230 days.

180.  Upon information and belief, the request has been with Lieutenant General McConville for at least forty days, well beyond the thirty-day maximum allowed by the regulations.

181.  This delay in granting religious accommodation requests is part of a pattern and practice of unlawful delay. According to a 2015 report by the Department of Defense Inspector General, the Army failed in 2014 to "consistently evaluat[e] religious accommodation requests within established timeframes." *See* Report No. DODIG-2015-148 at *i*. The report recommended that the military "streamline existing procedures to ensure requests for accommodation" are "evaluated

within the timeframes established by Department of Defense Instruction 1300.17." *Id.* at 15. The report documented Lieutenant General McConville's specific acknowledgement of the Inspector General's recommendation, although Lieutenant General McConville also noted that the regulatory deadlines may be impractical. *Id.* at 53. The report further documents that the Marines always met the regulatory deadlines, were about four times faster than the Army on average, and processed more accommodation requests than the Army. *Id.* at 13.

182.  While Lieutenant General McConville and the Army are thus clearly aware of Specialist Kanwar Singh's need for a religious accommodation, on Saturday, March 12, 2016, while Specialist Kanwar Singh was doing weekend drill with his unit, his First Sergeant called him out in front of the entire unit of approximately 200 soldiers to meet with the unit commander—Captain Kyle Moore.

183.  Captain Moore informed Specialist Kanwar Singh that the Army G-1—*i.e.*, Lieutenant General McConville—had reached out to his commander, LTC Jason Oberton, to ask if Specialist Kanwar Singh would be willing to cut his hair to attend Basic Combat Training starting May 31, 2016.

184.  Specialist Kanwar Singh politely responded that he could not cut his hair, which was the reason his request for a religious accommodation was pending in the first place.

185.  In that meeting, Specialist Kanwar Singh was also informed that the forty-five day advance requirement for getting the accommodation was actually forty-five *business* days, meaning he would need the accommodation by April 6 if he wanted to attend Basic Combat Training.

186.  Specialist Kanwar Singh was understandably disturbed, because missing that deadline would disrupt a carefully structured series of events that are essential to allow him to remain in the Army.

187.  Basic Combat Training lasts ten weeks and is a prerequisite for Specialist Kanwar Singh to attend Officer Candidate School at Camp Edwards, Cape Cod, Massachusetts.

188.  Officer Candidate School is only offered twice yearly, beginning in September and March.

189.  It lasts eighteen months and is fulfilled on the standard National Guard schedule of one weekend duty per month, plus two full weeks annually.

190.  Completing Officer Candidate School is a prerequisite for Specialist Kanwar Singh to select his specialty and complete his Military Occupational Specialties (MOS) qualifications or Basic Officers Leaders Course (BOLC).

191.  Specialist Kanwar Singh's service contract requires him to start Officer Candidate School within one year of enlistment and to accept a commission as a Second Lieutenant within three years of enlistment. *See* Exhibit 5 (Student Loan Repayment Program Addendum).

192.  For multiple reasons, it would be almost impossible for Specialist Kanwar Singh to meet these deadlines if he misses his May 31 Basic Combat Training start date.

193.  Although basic combat training is available around the country throughout the year, significant lead time is required to reserve a spot.

194.  More importantly, Specialist Kanwar Singh has already committed to teach at Harvard University's Division of Continuing Education for the 2016-2017 academic year. Being forced to

break that commitment would cause a significant injury to his reputation and career opportunities there.

195.  Specialist Kanwar Singh is also under obligation with his full-time employer, Hamersley Partners, to complete certain required Securities License Examinations—which will require several months of preparation—by December 31.

196.  He negotiated these dates with his employer so they would allow him to take leave from the firm this summer to complete basic combat training.

197.  On March 17, 2016, counsel for Specialist Kanwar Singh notified the Army that Specialist Kanwar Singh would have no choice but to request an emergency injunction in court to get a timely ruling on his request for accommodation before the April 6 deadline. On Friday, March 18, at 7:30 PM, counsel for the Army responded that the April 6 date no longer applied and that Specialist Kanwar Singh's spot would be saved for him until the Army decided on his accommodation.

198.  In sum, Specialist Kanwar Singh has made important career decisions in anticipation that the Army would treat him equally under its regulations and timely consider his request for accommodation.

199.  If the Army delays his accommodation beyond his ship date, he will be forced to either break his commitments to his civilian employers or lose the opportunity to serve in the Army, either of which would cause significant harm to his professional opportunities.

<u>Specialist Harpal Singh's Commitment to the Sikh Faith and Desire to Serve in the Army</u>

200.  Specialist Harpal Singh was born in Delhi and raised in the village of Sagra, Punjab, India to a devout Sikh family.

201.  His commitment to military service is rooted in his faith. He maintains a turban, unshorn hair and an unshorn beard in compliance with the Sikh religious mandates. Indeed, he has been a practicing Sikh his entire life, maintaining these articles of faith since childhood.

202.  For him, maintaining these Sikh articles of faith is a constant reminder to embody the Sikh values of discipline, self-sacrifice, and service to others—principles that also undergird his desire to serve in the Army.

203.  Specialist Harpal Singh has had a longstanding desire to participate in military service. Indeed, after finishing university, he applied for admission to the Indian Naval Academy. He passed all of the relevant tests but was not able to be admitted due to colorblindness.

204.  Specialist Harpal Singh pursued a career in telecommunications technology. In 2005, he had obtained a Bachelors of Technology (B.Tech) degree in electrical and electronics engineering from the Uttar Pradesh Technical University, in Lucknow, India. He began working in the telecommunications technology sector and was deployed around the world—including Ghana, Russia, and the Middle East—to work in this capacity for Ericsson, a large Swedish telecommunications company.

205.  As part of his work for Ericsson, he eventually immigrated to the United States and, for the last five years, has been based in the San Francisco Bay area, where he works as a contractor for Ericsson. In this capacity, he sets up cellular communications networks.

206.  In his free time, Specialist Harpal Singh is an avid outdoorsman and traveler. He enjoys mountaineering, snowboarding, back country snow-shoeing and skiing, hiking, and trail running. He enjoys meeting new people and experiencing new cultures. One of his travel goals is to visit all fifty states in America; in the five years he has lived in the United States, he has already visited twenty-two.

207.  Specialist Harpal Singh has continued to pursue his dream of military service by joining the Army and serving the United States, the country where he and his wife have chosen to settle.

208.  Specialist Harpal Singh first sought to join the United States Army in 2011. However, when he visited the recruiting center, he was told that the MAVNI program did not have any open places.

209.  In 2012, he tried again. Two friends with similar skills who went to join at the same time—and who were both engineering contractors for Ericsson—were both admitted into the program, while he was told he could not join because of his beard and turban.

210.  Specialist Harpal Singh learned from one of his friends who had joined the Army that the Army had announced that it would begin accommodating religious observant Sikhs. Still desiring to serve, Specialist Harpal Singh reapplied in spring 2015 and ultimately signed a contract in November to join through the MAVNI program.

211.  He was recruited through the MAVNI program because of his language skills and cultural knowledge of Punjabi, which he speaks, reads and writes in fluently. In addition, he speaks, reads, and writes Hindi fluently, and he speaks Urdu fluently. All three languages are considered a

priority for the Army, such that it recruits native speakers through the MAVNI program to advance the interests of the United States.

212.  Specialist Harpal Singh submitted his request for accommodation on November 9, 2015. *See* Exhibit 6 (Specialist Harpal Singh's initial request for religious accommodation). The request has now been pending for over 140 days.

213.  Since that time he has been in limbo waiting for the military to decide whether he will be allowed to serve.

214.  Specialist Harpal Singh is scheduled to report for BCT on May 9, 2016.

215.  If his accommodation is not granted before that date, Specialist Harpal Singh may lose his opportunity to serve in the United States Army.

<u>Private A.S.G.'s Commitment to the Faith and Desire to Serve in the Army</u>

216.  Private A.S.G. was born and raised in Ashburn, Virginia, into a devout Sikh family. His commitment to military service is also rooted in his faith.

217.  He maintains a turban, unshorn hair, and an unshorn beard in compliance with Sikh religious mandates. Indeed, he has been a practicing Sikh his entire life, maintaining these articles of faith since childhood.

218.  Private A.S.G. has always had a strong desire to engage in service to his family and community, including a longstanding desire to participate in military service. Indeed, Private A.S.G.'s dedication to U.S. military life and service began long before he was age-eligible to serve.

219.  Private A.S.G. is currently a senior at Briar Woods High School in Ashburn, Virginia. Because his school does not have a JROTC program, he vigorously sought alternative opportunities to gain military experience.

220.  Private A.S.G. has volunteered for both the Civil Air Patrol and the Virginia Defense Force in preparation for a career in military service.

221.  As a member of the Civil Air Patrol, Private A.S.G. practiced drills and engaged in character-building exercises. During his time with the Virginia Defense Force, he also participated in numerous drills and was involved in a civil support mission conducting crowd control in Winchester, Virginia. Private A.S.G. has also assisted local police in directing vehicular and pedestrian traffic during the Apple Blossom Festival, when the number of visitors to the town substantially increases.

222.  As a seventeen-year-old, he was awarded the Virginia Defense Force Medal for his service during his monthly drills. Private A.S.G. has also received praise and commendation from his Virginia Defense Force commander, CSM Christopher S. Howlett, who noted that "his enthusiasm and dedication set him above the other young men and women in his unit" and that he "was attentive to his duties and worked diligently to master his soldier's skills." *See* Exhibit 7 (Letter of Recommendation from CSM Christopher C. Howlett, Virginia Defense Force 3rd Regiment).

223.  CSM Howlett further explained that Private A.S.G.'s Sikh articles of faith posed no impediment to service, stressing that "PVT [A.S.G.]'s hair and headgear were cause for questions but they were answered with positive explanations of Sikh ideals and martial history." *Id.*

37

224.  Private A.S.G.'s dedication has not gone unnoticed by his educators. Linda Gross, Private A.S.G.'s former social studies teacher who hails from a long line of military personnel, said of the young man, "[h]e has a strong love of his country and his faith. His faith is an integral part of who he is and helped him develop into the young man that he is today." *See* Exhibit 8 (Letter of Recommendation from Linda Gross, Briar Woods High School); and Exhibit 9 (Letter of Recommendation from Elizabeth F. Dekenipp, School Counselor, Briar Woods High School).

225.  In his free time, Private A.S.G. is an avid athlete. He competes in wrestling, cross-country running, and track, and he previously played basketball for his county.

226.  Private A.S.G. was recently admitted to George Mason University. He plans to enroll this fall and join the university's ROTC program while continuing his service with the Virginia National Guard.

227.  In sum, Private A.S.G. embodies strong moral character, love for and commitment to his country, and is an ideal candidate for the Virginia National Guard and the U.S. Army. He is eager to achieve his dream of military service though the U.S. Army while retaining his right to practice his faith.

228.  Private A.S.G.'s request for accommodation was submitted on March 16, 2016. *See* Exhibit 10 (Private A.S.G.'s request for religious accommodation).

229.  Since the time he enlisted in the Virginia Army National Guard in December of 2015, because of his Sikh articles of faith he has been denied the opportunity to participate in monthly drills that would help prepare him for basic training.

230.  When being interviewed in connection with his request for accommodation, the chaplain for the Virginia National Guard asked him what he would do if he were in battle against other Sikhs—would he be able to kill them?

231.  Private A.S.G. responded that as a member of the National Guard, his first duty of course would be to his country. He felt that questioning his patriotism because of his faith was inappropriate.

232.  Private A.S.G. is currently scheduled to begin BCT on May 23, 2016. If his accommodation has not been granted by that time, he may be deprived of the opportunity to continue serving in the Virginia Army National Guard.

The Army's Religious Accommodation Regulations

233.  The Army's uniform regulations allow soldiers to wear religious headgear while in uniform if the headgear is (1) "subdued in color," (2) "can be completely covered by standard military headgear," (3) "bears no writing, symbols, or pictures," and (4) "does not interfere with the wear or proper functioning of protective clothing or equipment." Army Reg. 600-20, § 5-6*h*(4)(g), http://www.apd.army.mil/pdffiles/r600_20.pdf.

234.  All three Plaintiffs' turbans would comply with all these requirements except that a matching turban would replace standard issue headgear. All three Plaintiffs will wear their unshorn hair neatly wrapped into their turbans, well above the edge of their collars.

235.  With respect to facial hair, Army regulations allow sideburns and a mustache as long as they are "neatly trimmed, tapered, and tidy." Army Reg. 670-1, § 3-2*a*(2)(a)-(b), http://www.apd.army.mil/pdffiles/r670_1.pdf.

39

236.  Although Plaintiffs' sideburns, mustaches, and beards cannot be trimmed, they would be kept neat and tidy, with their beards tied and tucked close to their face.

    a.  In non-field Garrison settings, Plaintiffs will wear turban made of ACU camouflage material to match their uniforms.

    b.  In field settings, Plaintiffs will wear field turbans made of ACU camouflage material to match their uniforms.

    c.  Plaintiffs will wear their Kevlar helmets using the field turban or an ACU-pattern "patka" (small turban).

    d.  In settings where a Class A uniform is appropriate, Plaintiffs will wear a black turban to match the black standard-issue berets worn with Class A uniforms.

237.  Department of Defense and Army regulations contemplate religious exceptions to the grooming policy. Department of Defense Instruction 1300.17 expressly provides that "the DoD places a high value on the rights of members of the Military Services to observe the tenets of their respective religions." Dep't of Def. Instruction 1300.17(4)(a), http://www.dtic.mil/whs/directives/corres/pdf/130017p.pdf. Thus, it promises that "[r]equests for religious accommodation *will* be resolved in a timely manner and *will* be approved," so long as they do not "adversely affect mission accomplishment, including military readiness, unit cohesion, good order, discipline, and health and safety." Dep't of Def. Instruction 1300.17(4)(e) (emphases added).

238.  The process for obtaining an accommodation, however, is onerous.

239.  While the request for accommodation is pending, soldiers requesting the accommodation are expected to comply with the uniform and grooming regulations, even if doing so violates their religious beliefs. Dep't of Def. Instruction 1300.17(4)(g) ("Service members . . . will comply with

the policy, practice, or duty from which they are requesting accommodation . . . unless and until the request is approved."); Army Reg. 600-20, § 5-6*i*(1) (same).

240.   But Army policy and Congressional guidance has been trending toward eliminating the requirement that soldiers be forced to violate their faith while accommodation requests are pending. *See* Comm. on Armed Services, 114th Cong., Rep. on H.R. 1735 154-155 (May 2015); *see also* Exhibit 11 (USAREC Message 15-032). Twenty-seven retired U.S. Generals, 105 Members of Congress, and fifteen U.S. Senators have all called on the military to end the presumptive ban against Sikhs serving in the military. *See* Exhibits 18-20.

241.   In contrast with the onerous procedures for obtaining a religious exception, soldiers who need a *medical* exception for a beard can get one by having their doctor enter a "permanent profile" in their file, which is only reassessed annually. Technical Bulletin Med 287 § 2-6*b*(2), http://armypubs.army.mil/med/DR_pubs/dr_a/pdf/tbmed287.pdf.

242.   The Technical Bulletin for medical exceptions acknowledges that "[t]he existence of a beard does not prevent performance of most military duties." *Id.* § 2-6*c*(1).

243.   Therefore, the Technical Bulletin continues, "the fact that a profile is awarded authorizing the growth of a beard should not ordinarily require any functional limitations requiring a change or limitation in the performance of military duties." *Id*.

244.   A soldier with a medical beard exception cannot be required to shave, unless his "unit is in, or about to enter, a situation where use of a protective mask is required and where inability to safely use the mask could endanger the Soldier and the unit." *Id.* § 2-6*c*(2). This authority cannot

be used "for maneuvers and other tactical simulations. It should only be used when there is an actual need to wear the protective mask in a real tactical operation." *Id.*

245. Since 2007, the Army has authorized "at least 49,690 permanent shaving profiles and 57,616 temporary shaving profiles." *Singh v. McHugh*, 109 F. Supp. 3d 72, 78 (D.D.C. 2015). This includes "not only enlisted men but officers bound to ensure that the men who serve under them are clean-shaven." *Id.*

246. In the *Singh v. McHugh* litigation, the Army did not "claim[] or show[] that even one of the more than 100,000 soldiers who have been permitted to grow a beard since 2007—including many who have served in deployed environments—have been ordered to shave it for any reason." *Id.* at 96.

247. Indeed, the Army admitted that it "does not always enforce grooming policies pertaining to beards" even "when operational necessity requires." *Id.* at 95 n.17.

248. This flexible treatment is evident from the experience of many Special Forces soldiers who served in Afghanistan while growing full beards.

Other Sikhs in the Army

249. Plaintiffs would not be the first observant Sikhs to serve in the military.

250. Indeed, Sikhs proudly served in the U.S. Army without impediment during the Vietnam War and prior conflicts dating back to World War I.

251. Around 1981, however, military policy was changed to prohibit exemptions to the uniform requirements for visible articles of faith. While some exceptions subsequently were made for the Jewish yarmulke, the general rule was that turban-wearing Sikhs maintaining unshorn hair

42

and beards were disallowed from serving. *See* Dep't of Def. Instruction of Feb, 3, 1988, 1330.17; Army Reg. 600-20 §§ 5-6 (4)(g) (2009) ("The Army does not accommodate exceptions to personal grooming standards for religious reasons . . . .").

252.   On information and belief, many Sikhs who were already in the Army were grandfathered under the 1981 policy change and allowed to continue their service.

253.   One of these soldiers, Colonel Gopal S. Khalsa, served in the Special Forces Unit for ten years on Parachute Status and as a Battalion Commander overseeing an 800-person intelligence group. Exhibit 12 ¶¶ 12-13, 17 (Declaration of Colonel Gopal Singh Khalsa). He received a Meritorious Service Medal and Silver Oak Leaf Cluster Award, among many other honors, and in 2004, was inducted into the Officer Candidate School Hall of Fame. *Id.* at ¶¶ 8, 21.

254.   Another Sikh soldier, Sergeant Sevak Singh Kroesen**,** was attached to the Signal Company, 11th Special Forces Group, after which he successfully completed airborne (paratrooper) and Radio Teletype Transmission Operator training. He then completed his Special Forces Qualification Courses and became a Special Forces Communications Sergeant. Sergeant Kroesen subsequently completed his schooling, training, and missions around the world, all with honor and distinction. He was honorably discharged from active duty in 1991.

255.   Sergeant Kirnbir Singh Grewal served in the U.S. Army from 1977 to 1984. Throughout his time in the military, he used the same standard-issue gas mask and helmet as other members of the Army. Indeed, his responsibilities included teaching other soldiers to use protective gear to survive nuclear and biological warfare.

256.  These and other Sikh soldiers served with distinction, all while maintaining their Sikh articles of faith.

257.  Over the last six years, four other Sikhs have been granted religious accommodations, allowing them to serve in the Army with their articles of faith intact.

258.  The first, Corporal Simran Preet S. Lamba, enlisted in August 2010. Fluent in Punjabi and Hindi, he was recruited through the MAVNI program for his cultural and language skills. He served in a medical battalion as a Soldier Medic and was recognized as a "tremendous Soldier" who "had an amazing impact on his peers and supervisors." Exhibit 13 (Letters of recommendation for Corporal Simran Preet S. Lamba). In June 2014, he received an Army Commendation Medal for his selfless service and dedication to duty. Exhibit 14 ¶ 16 (Declaration of Corporal Simran Preet S. Lamba). He is currently in the Individual Ready Reserve.

259.  Major Tejdeep S. Rattan, a dentist, entered active duty in January 2010 after receiving a religious accommodation. In 2011, he was deployed to Afghanistan where he volunteered to serve in a remote forward operating base. For exceptional service during deployment, he was awarded an Army Commendation Medal and NATO medal.[12] His superiors have noted that he "wears the uniform with pride"; has "[m]ilitary bearing" that is "beyond reproach"; is a "charismatic officer who leads from the front" and "serves as a great mentor for less experienced officers"; and

---

[12]  NATO Unclassified, *NATO Meritorious Service Medal Awards – Autumn 2011*, at 2, http://www.nato.int/ims/docu/msm_awards.pdf.

"[i]nspires, motivates, and encourages subordinates." Exhibit 15 (Major Rattan Officer Evaluation Report from 2014). Major Rattan is currently in the U.S. Army Reserve Officer Corps.

260.   Major Kamaljeet S. Kalsi began active duty in June 2010. He was also deployed to Afghanistan in 2011 and was awarded a Bronze Star Medal upon his return for his exceptional service. In support of the award, an official recommendation from Major Kalsi's superiors cited his resuscitation back to life of two patients who were clinically dead on arrival; his expert emergency care of over 750 service members and civilians; coordination of five mass casualty exercises; and his general "commitment and leadership above and beyond that of his general duties." Exhibit 16 ¶ 8 (Declaration of Major Kamaljeet S. Kalsi) His superiors have noted that he has "consistently demonstrated a strong commitment to improving Army Medicine," "exceeded all expectations," and "possesses absolutely unlimited potential as a leader." Exhibit 17 at 2 (Major Kalsi Officer Evaluation Report from 2011). He is currently in the U.S. Army Reserve Officer Corps.

261.   A fourth Sikh soldier has recently been granted a temporary accommodation to serve in active duty with his articles of faith intact. Captain Simratpal Singh graduated from West Point in 2010, where he complied with the military's dress code requirements. *Singh v. Carter*, No. 16-cv-399, 2016 WL 837924, at *2 (D.D.C. March 3, 2016). He graduated from Ranger School, served as a platoon leader in a deployment to Afghanistan from April 2012 to January 2013, and was awarded a Bronze Star Medal for his "exceptional and meritorious service." *Id.* In October 2015, as he was beginning a new post, Captain Singh submitted a request for a religious accommodation to comply with the Sikh articles of faith to his new commander in the 249th Engineer Battalion

Prime Power at Fort Belvoir, Virginia. *Id.* Captain Singh was granted a temporary accommodation on December 9, 2015. *Id.* at *3. His accommodation has been extended until March 31, 2016, while the Army decides whether to grant a more permanent accommodation, and thereafter until Captain Singh's request for relief in court can be resolved if necessary. *Id.* at *5 n.1. Thus, Captain Singh has served without incident for over three months with his articles of faith intact, and has successfully passed standard protective-mask testing.

262.  The Sikh articles of faith of these four recently accommodated U.S. Army soldiers have in no way impeded their military service—even while deployed abroad in hostile territory. All of them have met the same fitness and safety standards as their fellow soldiers.

263.  The government thus has no interest in excluding Sikhs from the U.S. military, much less a compelling one.

## CLAIMS

## COUNT I

### Violation of the Religious Freedom Restoration Act
### Substantial Burden

264.  Plaintiffs incorporate by reference all preceding paragraphs.

265.  Plaintiffs' sincerely-held religious beliefs prohibit them from removing their turbans, cutting their hair, or shaving their beards. Plaintiffs' compliance with these beliefs is a religious exercise.

266. The Army's discriminatory treatment and regulations create government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs.

46

267. The Army's discriminatory treatment and regulations chill Plaintiffs' religious exercise.

268. The Army's discriminatory treatment and regulations impose a substantial burden on Specialist Kanwar Singh, Specialist Harpal Singh, and Private A.S.G.'s religious exercise.

269. The Army's discriminatory treatment and regulations do not further a compelling governmental interest as applied to Plaintiffs.

270. Applying the Army's discriminatory treatment and regulations to Plaintiffs is not the least restrictive means of furthering any compelling governmental interest.

271. The Army's discriminatory treatment and enforcement of its grooming and personal appearance regulations thus violate rights secured to Plaintiffs by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*

272. Absent injunctive and declaratory relief, Plaintiffs have been and will continue to be harmed.

## COUNT II

### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause
### Burden on Religious Exercise

273. Plaintiffs incorporate by reference all preceding paragraphs.

274. Plaintiffs' sincerely held religious beliefs prohibit them from removing their turbans, cutting their hair, or shaving their beards. Plaintiffs' compliance with these religious beliefs is a religious exercise.

275. The Army's grooming and personal appearance regulations are not neutral.

276. The discriminatory treatment of Plaintiffs is not neutral.

277. The Army's grooming and personal appearance regulations are not generally applicable.

278. The discriminatory treatment of Plaintiffs is not generally applicable.

279. Defendants have created categorical exemptions and individualized exemptions from their grooming and personal appearance regulations.

280. The Army's discriminatory grooming and personal appearance regulations create government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs.

281. The Army's discriminatory treatment and regulations chill Plaintiffs' religious exercise.

282. The Army's discriminatory treatment and regulations expose Plaintiffs to substantial consequences for their religious exercise, including the loss of their military careers.

283. The Army's discriminatory treatment and regulations burden Plaintiffs' religious exercise.

284. The Army's discriminatory treatment and regulations further no compelling governmental interest.

285. The Army's discriminatory treatment and regulations do not further a compelling governmental interest and are not the least restrictive means of furthering Defendants' stated interests.

286. The Army's discriminatory treatment and enforcement of its grooming and personal appearance regulations thus violate Plaintiffs' rights as secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

287. Absent injunctive and declaratory relief against the Army's regulations, Plaintiffs have been and will continue to be harmed.

## COUNT III

**Violation of the First Amendment to the United States Constitution
Free Exercise Clause
Intentional Discrimination**

288.  Plaintiffs incorporate by reference all preceding paragraphs.

289.  Plaintiffs' sincerely held religious beliefs prohibit them from removing their turbans, cutting their hair, or shaving their beards. Plaintiffs' compliance with these religious beliefs is a religious exercise.

290.  Historically, the Army has allowed Sikhs to serve in the military with their articles of faith intact.

291.  In the past six years the Army has admitted at least four other observant Sikhs, allowing them to serve in the military without violating their religious convictions.

292.  Despite being informed in detail of Plaintiffs' beliefs, Defendants have declined to grant them an accommodation that would allow them to comply both with their beliefs and with the Army's regulations.

293.  Defendants have no legitimate basis for denying Plaintiffs a religious accommodation.

294.  Defendants are discriminating against Plaintiffs because of their religion.

295.  Defendants have targeted Plaintiffs for heightened scrutiny because they have requested an accommodation for their religious beliefs.

296.  The Army's regulations, the threatened enforcement of the regulations against Plaintiffs, and the Army's discriminatory treatment of Plaintiffs thus violate their rights under the Free Exercise Clause of the First Amendment of the United States Constitution.

297.  Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT IV

### Violation of the First Amendment to the United States Constitution
### Freedom of Speech

298.  Plaintiffs incorporate by reference all preceding paragraphs.

299.  The Army's regulations prohibit Plaintiffs from expressing their faith through wearing their turbans, wearing uncut hair, and maintaining their beards.

300.  The Army's discriminatory treatment and regulations place a chilling effect on Plaintiffs' speech.

301.  The Army's discriminatory treatment and regulations constitute content discrimination.

302.  The Army's discriminatory treatment and regulations constitute viewpoint discrimination.

303.  As applied to Plaintiffs, the Army's discriminatory treatment and grooming and personal appearance regulations are not necessary for good order, discipline or national security and do not satisfy strict scrutiny.

304.  The Army's discriminatory treatment of Plaintiffs and enforcement of its grooming and personal appearance regulations against Plaintiffs thus violate their rights under the Free Speech Clause of the First Amendment of the United States Constitution.

305.  Absent injunctive and declaratory relief against the Army's regulations, Plaintiffs have been and will continue to be harmed.

## COUNT V

### Violation of the Fifth Amendment to the United States Constitution
### Due Process

306.  Plaintiffs incorporate by reference all preceding paragraphs.

307.  Free exercise of religion is a fundamental right.

308.  Plaintiffs' sincerely held religious beliefs prohibit them from removing their turbans, cutting their hair, or shaving their beards. Plaintiffs' compliance with these religious beliefs is a religious exercise.

309.  Plaintiffs' fundamental right to engage in religious exercise has been burdened by the Army's regulations and its denial of religious accommodations.

310.  The Army's discriminatory treatment and enforcement of its grooming and personal appearance regulations against Plaintiffs thus violate their rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

311.  Absent injunctive and declaratory relief against the Army's regulations, Plaintiffs have been and will continue to be harmed.

## COUNT VI

### Violation of the Fifth Amendment to the United States Constitution
### Equal Protection

312.  Plaintiffs incorporate by reference all preceding paragraphs.

313.  Other military service members similarly situated to Plaintiffs have been granted accommodations for their religious exercise.

314.  The Army accommodates other types of personal expression of other service members.

51

315.  The Army accommodates the grooming and attire preferences or needs of other service members.

316.  The Army has admitted other soldiers with skills similar to Plaintiffs.

317.  The Army's discriminatory treatment of Plaintiffs thus violates their rights under the Equal Protection Clause of the Fifth Amendment to the United States Constitution.

318.  Absent injunctive and declaratory relief against the Army's regulations, Plaintiffs have been and will continue to be harmed.

## COUNT VII

### Violation of the Fifth Amendment to the United States Constitution
### Procedural Due Process

319.  Plaintiffs incorporate by reference all preceding paragraphs.

320.  Plaintiffs sincerely held religious beliefs prohibit them from removing their turbans or cutting their hair or shaving their beards. Plaintiffs' compliance with these religious beliefs is a religious exercise.

321.  Enforcement of the Army's regulations against Plaintiffs would result in the loss of their livelihood as soldiers and violate their procedural due process rights by wrongfully impairing their property and liberty interests.

322.  Absent injunctive and declaratory relief against the Army's regulations, Plaintiffs have been and will continue to be harmed.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a. Declare that the Religious Freedom Restoration Act and the Constitution of the United States require the Army to cease discriminating against Plaintiffs and accommodate their religious exercise in maintaining uncut hair and a beard and wearing a turban;

b. Issue a permanent injunction (1) enjoining Defendants from enforcing the Army's grooming and personal appearance regulations against Plaintiffs insofar as they require Plaintiffs to cut their hair, shave their beards, or cease wearing their turbans; (2) ordering Defendants to permit Plaintiffs to continue serving in the Army without regard to their unshorn hair, beards and turbans; and (3) ordering that the injunction will apply to all Army posts that Plaintiffs will hold in the future, unless the Army makes an individualized showing of a compelling governmental interest that cannot be satisfied by less restrictive means;

c. Nominal damages;

d. Award Plaintiffs the costs of this action and reasonable attorney fees; and

e. Award such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable.

Respectfully submitted this 29th day of March, 2016.

Eric S. Baxter (D.C. Bar No. 479221)
Eric C. Rassbach (D.C. Bar No. 493739)
Diana M. Verm (D.C. Bar No. 1811222)
Daniel Blomberg (*pro hac vice* pending)
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
(202) 955-0095
(202) 955-0090
ebaxter@becketfund.org

Amandeep S. Sidhu (D.C. Bar No. 978142)
Emre N. Ilter (D.C. Bar No. 984479)
McDermott Will & Emery LLP
500 North Capitol Street, N.W.
Washington, DC, 20001
(202) 756-8000 PHONE
(202) 756-8087 FAX
*asidhu@mwe.com*

Harsimran Kaur Dang (D.C. Bar No. 493428)
Gurjot Kaur (*pro hac vice* pending)
The Sikh Coalition
50 Broad Street, Suite 1537
New York, NY, 10004
(212) 655-3095 PHONE
*harsimran@sikhcoalition.org*

*Counsel for Plaintiffs*

54